# In the United States Court of Federal Claims

No. 15-501C

(October 1, 2021)
(Reissued: October 8, 2021)

|  |  |  |
|---|---|---|
| **3RD EYE SURVEILLANCE, LLC and DISCOVERY PATENTS, LLC**, | ) ) ) | Patent case; "all elements" test for infringement of a patent claim |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| **UNITED STATES**, | ) ) |  |
| Defendant, | ) ) |  |
| **and** | ) ) |  |
| **ELBIT SYSTEMS OF AMERICA, LLC, GENERAL DYNAMICS ONE SOURCE LLC, and NORTHROP GRUMMAN SYSTEMS CORPORATION**, | ) ) ) ) ) ) |  |
| Defendant-Intervenors. | ) ) |  |

Steven A. Kennedy, Kennedy Law, P.C., Dallas, Texas, for the plaintiffs.

James P. Hughes, Trial Attorney, Intellectual Property Section, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Sara Harrington, Deputy Assistant Attorney General, Civil Division, and Gary L. Hausken, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Kurt G. Calia, Covington & Burling LLP, Palo Alto, California, for defendant-intervenor Elbit Systems of America, LLC.

Scott A. Felder, Wiley Rein, LLP, Washington, D.C., for defendant-intervenor General Dynamics One Source LLC.

Gregory H. Lantier, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for defendant-intervenor Northrop Grumman Systems Corporation.

# OPINION & ORDER[1]

LETTOW, Senior Judge.

Pending before the court in this patent case is plaintiffs' motion for partial summary judgment as to Bellwether Systems Nos. Four and Five, *see* Pls.' Mot., ECF No. 495, both of which are allegedly infringing systems operated by a private entity for the government.[2]  At issue is Claim 6 of U.S. Patent No. 6,798,344 (the "'344 Patent"), titled "Security Alarm System and Method with Realtime Streaming Video."  Plaintiffs are 3rd Eye Surveillance, LLC and Discovery Patents, LLC.  A nongovernmental third-party entity, Science Applications International Corporation ("SAIC"), provides services to the government regarding Bellwether Systems Nos. Four and Five.  *See* Defs.' Stip., ECF. No. 526.[3]  Those systems consist of the Biometric Entry/Exit System ("BEES") the government uses at William P. Hobby Airport and Orlando International Airport, both of which are alleged to infringe Claim 6 of the '344 Patent.  Pls.' Mot. at 1.[4]  The government opposes the motion, arguing that plaintiffs have failed to prove all the elements of Claim 6.  *See* Def.'s Resp., ECF No. 509.  The parties have completed briefing.  *See* Pls.' Reply, ECF No. 513.  The court held a hearing on September 23, 2021, and the motion is ready for disposition.

For the reasons stated, the court denies plaintiffs' motion on the ground that they have not established that the BEES at the two airports infringe all elements of Claim 6 of the '344 patent.  This action is without prejudice to any contention that the BEES infringe other patent claims at issue in this action.[5]

---

[1] Because of the protective order entered in this case, this opinion was initially filed under seal.  The parties were requested to review the decision and provide proposed redactions of any confidential or proprietary information.  The resulting redactions are shown by brackets enclosing elipses, *e.g.*, "[***]."

[2] This action potentially relates to numerous federal installations and systems; the breadth and scope of which has complicated this litigation.  To address this complexity, the court "rein[ed] in the scope of the case by limiting plaintiffs' discovery requests to 11 potential[ly] infringing systems that will serve as bellwethers for further proceedings."  Order of July 28, 2020, ECF No. 381.  On August 14, 2020, plaintiffs designated eleven bellwether systems.  *See* Pls.' Notice, ECF No. 385.  System Nos. Four and Five are among the eleven.

[3] SAIC did not intervene in the case and is not before the court.

[4] For both System Nos. Four and Five, Unisys Corporation deployed the services prior to being acquired by SAIC in approximately March 2020.  Defendant represents that "Unisys Corporation previously provided services to the government in connection with Bellwether Systems Nos. Four and Five.  In March of 2020, SAIC assumed the operation [of] all activities related to Bellwether Systems Nos. Four and Five."  Defs.' Stip. n.2 (citations omitted).

[5] Plaintiffs are also the respective licensee and assignee of U.S. Patent No. 6,778,085 ("'085 Patent") and U.S. Patent No. 7,323,980 ("'980 Patent"), Pls.' Fourth Am. Compl. ¶¶ 14-15, the other patents at issue in this case.  Those patents are continuation-in-part applications of

## BACKGROUND[6]

### A. The '344 Patent

The application for the '344 Patent was filed on October 17, 2002, and the patent issued September 28, 2004.  U.S. Patent No. 6,798,344.  Plaintiff, Discovery Patents, LLC, is the assignee and plaintiff, 3rd Eye Surveillance, LLC, is the exclusive licensee of the '344 patent.  Pls.' Fourth Am. Compl. ¶¶ 14-15, ECF No. 323.  The patent sets out 16 claims and describes the inventions as "enhanc[ing] security alarm systems and services by providing secure, realtime video for the appropriate emergency response agency." '344 Patent col. 1, lines 45-47; *see also id.* at cols. 8-10.

The invention involves a three-part structure:  a video camera at a secured location, a central station, and emergency response agencies.  *See* '344 Patent col. 3, line 46 to col. 4, line 15.  The imaging device at the secured location sends real-time video to the central station in the event an alarm is triggered.  '344 Patent col 3., lines 56-60.  The central station then receives, processes, and displays the imagery sent from the secured location.  '344 Patent col. 3., lines 60-64.  From the central station, the imagery is simultaneously transmitted to one or more emergency response agencies.  '344 Patent col. 3, line 65 to col. 4, line 2.  The transmission from the secured location to the central station and from the central station to the emergency response agencies is done via a high-speed communications link, such as the Internet.  *See* '344 Patent, col. 2, lines 19-22; col. 3, lines 53-55.

### B. The Biometric Entry and Exit System

The Biometric Entry and Exit System has been installed for both entry and exit at the William P. Hobby Airport and the Orlando International Airport.  Pls.' Mot., Ex. 22 at 743-44.  The system "assists in verifying the identity of travelers," Def.'s Resp. at 2, by using a "Traveler Verification System," which is a "cloud-based matching service," Pls.' Mot., Ex. 6 at 256.  "At a high level, [the Traveler Verification System] is a three step process: 1) [b]uild the gallery, 2) [p]erform[] an identify operation, based on a match request, and 3) [r]eturn the match response." *Id.*, Ex. 13 at 501.  [***].  *Id.*, Ex. 6 at 256.  Second, a photo is taken of the traveler at the airport and submitted to the separate Traveler Verification System, which performs a matching process.  *Id.*  "[T]he captured photo is compared against the appropriate gallery photos in less than 2 seconds." *Id.*, Ex. 13 at 501.  The matching process "occurs in the [cloud service provider] environment," which requires that the "system . . . be connected to the Internet for matching to occur." *Id.*, Ex. 13 at 503-504.  Finally, a response is sent back to the capturing device and to

---

the application that resulted in the '344 Patent, *see* U.S. Patent No. 6,778,085 (issued Aug. 17, 2004); U.S. Patent No. 7,323,980 (issued Jan. 29, 2008).  "Plaintiffs maintain that Bellwether Systems 4-5 also infringe the claims of the [']980 and [']085 Patents," but they seek partial summary judgment only as to the '344 Patent at this time.  Pls.' Mot at 6.

[6] The following recitations do not constitute findings of fact by the court.  Instead, the recited factual elements are taken from the relevant complaint and the parties' briefs and attached appendices.

responding agencies, such as the Transportation Security Administration ("TSA"), United States Customs and Border Protection's ("CBP") workstations, and to CBP officers via the "Biometric Exit Mobile Application." *Id.*, Ex. 13 at 501.  [\*\*\*].  *Id.*, Ex. 13 at 501.

If a traveler [\*\*\*].  Pls.' Mot., Ex. 7 at 275.  [\*\*\*].  *Id.* at 11-12; *see also id.*, Ex. 7 at 275.  Other information about the traveler is also generated such as air travel history and border crossing times.  *See id.*, Ex. 7 at 278.  [\*\*\*].  *Id.* at 12.  [\*\*\*].  *Id.* at 13.

### C. Procedural History

Plaintiffs first filed suit against the government in May 2015, alleging patent infringement under 28 U.S.C. § 1498(a).  *See* Pls.' Compl., ECF No. 1.  The court issued its opinion on claim construction on September 25, 2018.  *See 3rd Eye Surveillance, LLC v. United States*, 140 Fed. Cl. 39 (2018), ECF No. 243.  Plaintiffs have filed three amended complaints, *see* ECF Nos. 22, 221, 308.  As discovery proceeded, the parties' documentary exchanges included descriptions of the Biometric Entry and Exit System.  *See, e.g.*, Pls.' Mot., Exs. 1-23. Based on that documentary record, plaintiffs contend that the Biometric Entry and Exit System used in Bellwether Systems Nos. Four and Five satisfy all elements of Claim 6 of the '344 Patent by "displaying realtime video of the secured location at the emergency response agency based on the realtime video signal transmitted from the secured location."  '344 Patent, col. 9, lines 4-6; *see* Pls.' Mot. at 25.  In opposition, the government argues that plaintiffs have failed to meet their burden of showing that the Biometric Entry and Exit System involves the transmission of real-time video to an off-location emergency response agency and asserts that genuine issues of material fact remain.  *See generally* Def's. Resp.

## STANDARDS FOR DECISION

### A. 28 U.S.C. § 1498(a)

Pursuant to 28 U.S.C. § 1498, the United States has waived sovereign immunity and granted this court exclusive jurisdiction to adjudicate patent infringement claims against the federal government "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same."  28 U.S.C. § 1498(a); *see FastShip, LLC v. United States*, 892 F.3d 1298, 1303 (Fed. Cir. 2018), *aff'g* 122 Fed. Cl. 71, 78 (2015) (recognizing that Section 1498 grants this court jurisdiction over patent infringement claims against the United States); *see also Hitkansut LLC v. United States*, 130 Fed. Cl. 353, 367 (2017), *aff'd*, 721 Fed. Appx. 992 (Fed. Cir. 2018).  Moreover, the statute additionally provides that "the *use or*

*manufacture* of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the [g]overnment and with the authorization or consent of the [g]overnment, shall be construed as use or manufacture for the United States." 28 U.S.C. § 1498(a) (emphasis added).  Such an unauthorized "use or manufacture of an invention" under Section 1498(a) is analogous to a taking of property under the Fifth Amendment of the United States Constitution.  *See Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984).  The government's "taking" of a nonexclusive and compulsory license to any United States patent occurs "as of the instant the invention is first used or manufactured by [or for] the [g]overnment."  *Decca Ltd. v. United State*s, 640 F.2d 1156, 1166 (Ct. Cl. 1980).

The government has waived sovereign immunity only for the compulsory taking of a non-exclusive patent license, and the government's liability under 28 U.S.C. § 1498 diverges from private liability under 35 U.S.C. § 271:

> Government liability under Section 1498 arises from the "use[ ] or manufacture[ ] by or for the United States."  There is no mention of liability for a "sale" to the United States of a device covered by a patent.  In contrast, with respect to private liability for patent infringement, the "sale" of a patented device is specifically defined in 35 U.S.C. § 271 as an act of infringement . . . .

*de Graffenried v. United States*, 25 Cl. Ct. 209, 215 (1992) (alterations in original); *compare* 28 U.S.C. § 1498, *with* 35 U.S.C. § 271.[7]

### B.  Patent Infringement

The court determines whether the government has engaged in direct infringement of a patent using a two-step process that parallels the analysis for infringement litigation between private parties.  *Lemelson v. United States*, 752 F.2d 1538, 1548 (Fed. Cir. 1985); *Casler v. United States*, 15 Cl. Ct. 717, 731 (1988), *aff'd*, 883 F.2d 1026 (Fed. Cir. 1989).  First, the court construes the claims of the patent; then, it compares those claims to the characteristics of the accused product or process.  *See JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329 (Fed. Cir. 2005).  The court previously completed claims construction in this case, *see 3rd Eye*, 140 Fed. Cl. 39, and has reached the second step.  "When comparing the patent claims to the accused device or process, the plaintiff has the burden of proving by a preponderance of the evidence that *every limitation* set forth in a patent claim is present in the accused device or

---

[7] Section 271 of Title 35 of the United States Code provides in relevant part:

> (a) . . . whoever without authority *makes, uses, offers to sell, or sells* any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a) (emphasis added).

process either literally or by a substantial equivalent." *FastShip*, 122 Fed. Cl. at 78 (citing *Boeing Co. v. United States*, 69 Fed. Cl. 397, 426 (2006) ("'[E]ach element of a claim is material and essential, and . . . for a court to find infringement, the plaintiff must show the presence of every element [for literal infringement] or its substantial equivalent [for infringement under the doctrine of equivalents] in the accused device.'") (alteration in original) (quoting *Lemelson*, 752 F.2d at 1551)). The plaintiff's failure to meet even one element within a claim, literally or by its substantial equivalent, negates a finding of infringement. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). This standard is commonly referred to as the "all elements" rule. *See TDM Am., LLC v. United States*, 92 Fed. Cl. 761, 768 (2010), *aff'd*, 471 Fed. Appx. 903 (Fed. Cir. 2012); *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

### C. Summary Judgment

A grant of summary judgment is appropriate when the pleadings, affidavits, and evidentiary materials filed in a case demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if it might "return a verdict for the nonmoving party." *Id.* If "the record taken as a whole [cannot] lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The burden of demonstrating the absence of any genuine dispute is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587-88 (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The nonmoving party may defeat summary judgment by presenting material facts of its own, more than "[m]ere denials or conclusory statements," that indicate "an evidentiary conflict created on the record." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). To establish "that a fact cannot be or is genuinely disputed," a party must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

## ANALYSIS

Plaintiffs' motion for partial summary judgment as to Claim 6 of the '344 Patent rests on documentary evidence of the operation of the BEES employed at Bellwether Systems Nos. Four and Five. *See* Pls.' Mot. In opposition, the government argues that plaintiffs have not proven that the Biometric Entry and Exit System satisfies the "video," "realtime," or "display[]" limitations of Claim 6. Def.'s Resp. at 7-14, 19. The government additionally cites plaintiffs' lack of evidence beyond basic documents in support of their contentions that the elements of

Claim 6 have been met. *Id.* at 20. The government therefore argues that the motion for partial summary judgment as to Systems Nos. Four and Five should be denied due to failure to meet the "all elements" rule. *Id.* at 6.

### A. Factual Disputes

The validity of plaintiffs' infringement claim, and the success of their motion for partial summary judgment as to Systems Nos. Four and Five, turns on whether the Biometric Entry and Exit System generates and transmits a "realtime video signal" from a "secured location" to a "central station" which in turn transmits and displays the video at "an emergency response agency." '344 Patent, col. 8, line 61 to col. 9, line 6. Plaintiffs argue that the Biometric Entry and Exit System satisfies all the limitations of the claim. According to plaintiffs, the Biometric Entry and Exit System consists of an imaging device at the secured locations of the William P. Hobby and Orlando International Airports, the central system of the Traveler Verification System, and the CBP imaging device and CBP workstations and mobile devices at the airport. *See* Pls.' Mot. at 14. Plaintiffs claim that realtime video is collected by the airport imaging device when it takes "live photographic images" of travelers, Pls.' Mot., Ex. 1 at 18, and transmits those images to the Traveler Verification System. *Id.* at 16. The Traveler Verification System then runs an algorithm to compare the captured images against a preselected gallery of photos and transmits the result of the comparison back to the original imaging device, CBP computer stations, and CBP mobile devices. *Id.* at 17. In support of these contentions, plaintiffs principally rely on documents provided by the government during discovery that detail the technical specifications of the Biometric Entry and Exit System. *See id.* at 14-17.

The government argues that the system does not satisfy the limitations of Claim 6 of the '344 Patent because it does not involve video—realtime or otherwise—and it is not displayed at an emergency response agency. *See generally* Def.'s Resp. Particularly, the government states that "[n]one of the evidence [p]laintiffs cite even suggests the [a]ccused [s]ystem performs a process involving 'video' of any kind," *id.* at 7-8, and that "[p]laintiffs failed to cite any evidence showing that such purported video is 'realtime.'" *Id.* at 13. Therefore, the principal questions disputed by the parties are (1) whether the live photographic images sent by the system constitute video, (2) whether the up to nearly 2 second delay caused by the matching algorithm causes the transmission to not be in realtime, and (3) whether the video is displayed at an emergency response agency.

### B. The "Video" Limitation

The government argues that plaintiffs have failed to establish that the any sort of video is taken and sent via the Biometric Entry and Exit System. Plaintiffs must prove that the accused system meets all the elements of the claim in order to make out a case for infringement. *See Cormack v. United States*, 122 Fed. Cl. 691, 700 (2015) ("The [p]laintiff's failure to meet even one element within a claim, literally or by its substantial equivalent, negates a finding of infringement."). To meet the video limitation, plaintiffs rely on the expert testimony of Dr. Clifford Reader who testified that "video . . . simply comprises a succession of digital images over time. . . . [A]t its core, video is a set of digital images." Hr'g Tr. 54:21 to 55:5 (July 2,

2018).[8]  To prove their contention that video is captured and transmitted by the system, plaintiffs point to the accused system's technical documents, which discuss the collection and transmission of "live biometric images" in the plural.  Pls.' Mot. at 16.  Hr'g Tr. 24:7-20 (September 23, 2021).[9]  They contend that the multiple live images sent via the system fit within Dr. Reader's testimony as to what constitutes video.  Hr'g Tr. at 23:4-16.  The government opposes this interpretation and maintains that no video is involved with the accused system.  Def.'s Resp. at 8-9.

When viewing the evidence in the light most favorable to the nonmoving party, the "live biometric images" discussed in the technical documents do not satisfy the video limitation of Claim 6 of the '344 Patent.  While plaintiffs rely on expert testimony that video is "a succession of digital images over time," Pls.' Reply at 6, they fail to consider the second half of Dr. Reader's testimony that "video is a *set* of digital images."  Hr'g Tr. 55:4-5 (July 2, 2018) (emphasis added).  While the technical documents explain that multiple images of a traveler may be taken and sent via the system, there is nothing in those documents that shows a set of digital images are sent that would constitute a video when viewed in succession.  Plaintiffs further argue that the training manuals, which show how the system *actually* operates as opposed to just how it *should* operate, refer to "live photographic images" in the plural, Pls.' Mot., Ex. 12 at 458, and this again, in the plaintiffs' view, satisfies the video limitation of the claim.  *See* Hr'g Tr. 40:8-21.  The fact that multiple images may be sent via the system does not itself turn those pictures into video without those pictures being part of a connected set.  Rather, the images of the display given in the technical documents show two photos—the captured photo and the stock photo for comparison—and no video.  *See* Pls.' Mot., Ex. 7 at 275, 298, 334.  When viewing the facts in the light most favorable to the nonmoving party, plaintiffs have failed to prove that any video is generated, transmitted, or displayed in order to fall within the contemplation of Claim 6 of the '344 Patent.  As such, plaintiffs have not met their burden of showing that all elements of the claim are met, and the court must deny the motion for partial summary judgment.  Nonetheless, the government's other contentions deserve analysis because they will affect future proceedings regarding each of the three patents at issue.[10]

### C.  The "Realtime" Limitation

---

[8] The government suggested that plaintiffs failed to follow court instructions by not providing further expert testimony.  Def.'s Resp. at 11.  The court's statement that expertise beyond that of an ordinary person in the art "would be helpful" was not a requirement of further expert testimony.  *See 3rd Eye Surveillance*, 140 Fed. Cl. at 59.

[9] The date will be omitted from future citations to the transcript of the hearing held on September 23, 2021.

[10] The court notes that the other two patents at issue, the '085 and '980 patents, are not limited to video images because they consistently refer to "imaging device" and "realtime imagery" in the claims, rather than "realtime video," as does the '344 Patent.  *Compare* '085 Patent, Claim 1, line 66; Claim 7, line 22; *and* '980 Patent, Claim 1, line 38, Claim 11, line 23, *with* '344 Patent, Claim 1, line 19; Claim 6, line 62.

As to the second question of whether the transmission would constitute "realtime," the government argues that the "less than 2 seconds" required to compare the captured photo with the gallery photos is an "intentional delay" that renders the transmission not in realtime. Def.'s Resp. at 16 (quoting Pls.' Mot., Ex. 13 at 501). The court construed "realtime video" and its variants to mean "video or other pictoral or representational images derived from cameras or sensors made available for viewing as the actual events occur, subject to the laws of physics and the capability of the technology employed respecting transmission." *3rd Eye Surveillance,* 140 Fed. Cl. at 61.[11] Plaintiffs argue that the delay is part of the invention itself and is contemplated by the embodiment of the patent. Pls.' Reply at 8. Although Claim 6 does not, other claims within the '344 Patent, as well as the '980 and '085 patents, specify "processing" of realtime video or realtime images within the claims. *See, e.g.,* '344 Patent, col. 8, lines 49-56; '085 Patent, Claim 1, line 65; Claim 7, line 27; Claim 38, line 52, Claim 56, line 33, '980 Patent, Claim 1, line 43; Claim 11, line 27; Claim 31, line 53. The term "processing" has not been construed by the court. Moreover, the first embodiment of the '344 Patent states "[t]he security alarm system also includes a central station with means for *processing* and displaying realtime video." *Id.*, col. 2, lines 5-8 (emphasis added).

When viewing the facts in the light most favorable to the non-movant, the delay imposed by the processing algorithm is simply part of the "capability of the technology employed" which the court determined to be part of the meaning of "realtime," *3rd Eye Surveillance,* 140 Fed. Cl. at 61. The matching algorithm used to compare the captured photo and the gallery photos is part of the patented technology, and any resulting delay—especially one as minimal as "less than 2 seconds"—was contemplated by the patent itself where the embodiment provides for "processing." The realtime nature of the transmission is further supported by the technical documents which show that the captured photo is displayed as "live," *see e.g.*, Pls.' Mot., Ex. 8 at 334, the plain meaning of which encapsulates instantaneous or realtime. While the government is correct that this is in fact an intentional delay, the delay is contemplated by the patent and by the court in its claim construction. The transmission from the Traveler Verification System to CBP workstations and mobile devices is in realtime despite the "less than two second" delay imposed by the processing algorithm.

### D. The "Display" Limitation

The government lastly argues that the Biometric Entry and Exit System does not "display[] realtime video . . . at the emergency response agency." '344 Patent, col. 9, lines 4-5. Specifically, the government argues that plaintiffs failed to prove that realtime video is displayed by the system and also challenges that the secured location and the emergency response agency cannot be at the same location. Def.'s Resp. at 19. Plaintiffs reply that the technical documents

---

[11] The government argues that plaintiffs have made inconsistent arguments both at the claim construction hearing and in proceedings before the Patent Trial and Appeal Board ("PTAB"). Def.'s Resp. 17-18. The court is not persuaded by these arguments as it is expected that parties will change their arguments after a final decision for claim construction has been rendered, and the PTAB decision was vacated pursuant to the Supreme Court's decision in *Return Mail, Inc. v. United States Postal Service*, ___ U.S. ___, 139 S. Ct. 1853 (2019). *See* IPR 2016-01041 Order, ECF No. 304.

support that the transmission is displayed and that claim construction addressed that "a central monitoring station may be associated with . . . a government agency" that provides a response. *3rd Eye Surveillance,* 140 Fed. Cl. at 60 (internal quotations omitted).

The technical documents provide that "[t]he Traveler Information panel displays the live photo matched to the manifest or document photo" and the provided photos of the system are consistent with this step. Pls.' Mot., Ex. 7 at 274. Further, the documents show that [\*\*\*]. *Id.*, Ex. 9 at 393. The fact that [\*\*\*]. First, the court previously stated that the "monitoring station may be associated with . . . a government agency." *3rd Eye Surveillance,* 140 Fed. Cl. at 60 (internal quotation marks omitted). CBP is both a government agency and an emergency response agency in that it fulfills a law enforcement role. Further, the technical documents indicate that airline cameras may take and send the captured photos and receive the results, Pls.' Mot., Ex. 13 at 501, 503. Ultimately, the patent requires only that a transmission occur from the secured location to a central computer to an emergency response agency. The [\*\*\*]. Pls.' Mot., Ex. 13 at 501. This process satisfies the "display" limitation of Claim 6.

## CONCLUSION

For the reason that the accused infringing devices employ realtime imagery rather than realtime video, plaintiffs' motion for partial summary judgment based on Claim 6 of the '344 patent is DENIED.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge